UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN E. MCCULLOCH,<br><br>    Plaintiff,<br><br>    v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>    Defendant. | Case No. 19-cv-07716-SI<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER DENYING DEFENDANT'S OBJECTION TO EXTRINSIC EVIDENCE**<br><br>Re: Dkt. Nos. 40, 43 |

Plaintiff Kristin E. McCulloch challenges Hartford Life and Accident Insurance Company's ("Hartford Life") denial of plaintiff's long-term disability ("LTD") claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq*. On December 4, 2020, the Court held a bench trial.

Currently before the Court are parties' cross motions for judgment pursuant to Federal Rule of Civil Procedure 52. The parties have agreed that the proper standard of review is de novo. Dkt. Nos. 34 at 17; 35 at 2. This order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court GRANTS plaintiff's motion for judgment and DENIES defendant's motion for judgment.

**EVIDENTIARY RULING**

In support of plaintiff's claim that Harford Life erred in denying her Long Term Disability ("LTD") claim, plaintiff submitted a letter from the Social Security Administration ("SSA") awarding plaintiff monthly disability benefits. Ex. 3 Dkt. No. 35. The SSA letter is not in the administrative record because it was issued after Hartford Life completed a final review of plaintiff's LTD claim. Hartford Life objected to plaintiff's introduction of the SSA letter on the basis that the

letter was extrinsic evidence. Dkt. No. 40.

Generally, bench trials arising under ERISA are limited to the administrative record. *Opeta v. Northwest Airlines Pension Plan for Cont. Emp.*, 484 F.3d 1211, 1217 (9th Cir. 2007). However, the Court has discretion to consider extrinsic evidence when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943-944 (9th Cir. 1995).

After carefully considering the parties' arguments on the SSA letter, the Court finds that the SSA letter is necessary for an adequate review of Hartford Life's denial of plaintiff's LTD claim. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) ("not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence"); *see e.g.*, *Nagy v. Group Long Term Disability Plan for Employees of Oracle America, Inc.*, 183 F.Supp.3d 1015, 1025-26 (N.D. Cal. 2016) (admitting SSA decision where decision occurred over a year after administrator denied plaintiff's appeal of denial of benefits); *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F.Supp.2d 1151, 1165 n4 (N.D. Cal. 2010) ("The Court considers Plaintiff's award of SSDI benefits because it constitutes additional evidence that she could not have presented in the administrative process.").

## FINDINGS OF FACT

**A.   Parties**

Plaintiff Kristin E. McCulloch, now fifty-one years old, was an Employee Benefits Insurance Agent for BB&T Corporation from June 2015 to March 2018. *See* Dkt. No. 34 at 4; Dkt. No. 35 at 5. Plaintiff's annual salary was approximately $319, 353. AR 567.

Plaintiff suffers from involuntary tremors and body jerking, fatigue, and cognitive impairment. AR 85, 105. Plaintiff cannot drive because of her involuntary tremors and body jerking. AR 1654. Plaintiff's conditions are either the result of Lyme disease, Central Nervous System Vasculitis, or Fibromyalgia syndrome. AR. 277, 1654.

Defendant Hartford Life is an insurance Plan provider for BB&T Corporation. AR 325, 346.

1    Hartford Life insures short term disability ("STD") and long term disability ("LTD") benefits under
2    a group disability Plan ("Plan"), effective January 1, 2004.  AR 325.  Defendant is also the
3    administrator of the Plan and determines whether a claimant is disabled under the terms of the Plan.
4    AR 346.

Plaintiff was a covered participant of defendant's LTD and STD Plans.  AR 82, 103.  Plaintiff left her job as an Employee Benefits Insurance Agent in March 2018 and applied for STD benefits. On June 18, 2018, Hartford Life approved plaintiff's STD claim.  AR 1652.  Hartford life stated that plaintiff's disability, involving brain inflammation, headaches, body jerking that caused plaintiff to lose her ability to drive, and tremors, was medically supported.  AR 1654.

Plaintiff applied for LTD benefits on August 17, 2018.  AR 78-79. On November 2018, Hartford Life denied plaintiff's LTD claim and stated that plaintiff failed to confirm the severity of her symptoms through objective testing. AR 103-08.

Plaintiff appealed defendant's denial of plaintiff's LTD claim. AR 533-552. On November 20, 2019, defendant denied plaintiff's appeal and upheld its prior determination that plaintiff was not entitled to LTD benefits under the Plan.  AR. 82-87.

On November 22, 2019, plaintiff filed a complaint against Hartford Life, alleging a cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover LTD benefits under the terms of Hartford Life's Plan.  Dkt. No. 1, Compl. ¶ 1.

## B.   Relevant Insurance Plan Provisions

Hartford Life's LTD Plan provides that Hartford Life will pay a monthly disability benefit to an employee issued under the Plan if Hartford Life receives proof of continued disability after a 36-month "Elimination Period."  AR 1861-1870.  The Plan awards disability benefits based on whether a claimant is a Class 1 or Class 2 employee.[1]  AR 1863.

The Plan defines disability as a condition that "prevent[s] a claimant from performing one

---

[1] The parties dispute whether plaintiff is a Class 1 or Class 2 employee. However, the parties agree that the issue before this Court is whether plaintiff qualifies as disabled under the Plan's "Your Occupation" definition.  Dkt. No. 30.

or more of the Essential Duties of Your Occupation during the Elimination Period."[2]  AR 1870. "Your Occupation" is defined as the Essential Duties a claimant performs for his or her employer. AR 1874.  The Plan defines an "Essential Duty" as a duty that is substantial, fundamental or inherent to the occupation, and cannot be reasonably omitted or changed.  AR 1871.  A disability must be caused from accidental bodily injury, sickness, mental illness, substance abuse, or pregnancy.  *Id*.

### C. Plaintiff's Occupation

#### 1. BB&T's Job Description

BB&T's job description explains that plaintiff, as an Employee Benefits Insurance Agent, was "[r]esponsible for solicitation, analysis, and placement of complex group health, group life, disability and other ancillary product cases for key clients."  AR 485, 1612.  The job description states that the essential duties of plaintiff's occupation are to "[d]evelop and maintain prospect list through internal and external sources for large case work"; "develop marketing plan and production goals annually"; "[d]eliver timely service, advice and professional counsel to the bank's clients"; and "[s]tay abreast of insurance industry trends and pursue[] continuing education." AR 485, 1612.

Plaintiff was required to maintain client relations and meet a yearly sales quota.  In doing so, plaintiff negotiated renewals, problem-solved, planned insurance designs, and performed financial modeling of different insurance carriers.  AR 1199.  Plaintiff had 15 clients, some of which were large companies with more than 100 employees.  *Id*.  Plaintiff drove to meet with each client once every three months.  *Id*.

---

[2] Employee Class 1 and 2 have different definitions of disability under the plan. AR 1870-71. Both classes define disability to mean "prevented from performing one or more of the Essential Duties of Your Occupation during the Elimination Period."
    Class 1 includes a requirement that a claimant be prevented from performing one or more of the Essential Duties of Your Occupation *following* the Elimination Period resulting in less than 80% of a pre-disability earnings.
    Class 2, however, adds additional requirements of prevention from performing one of more of the Essential Duties of Your occupation *during* the Elimination period for 36 months following the Elimination Period, resulting in less than 80% of pre-disability earnings *and* after that, any occupation.
    Because plaintiff's LTD claim is still in the initial 36-month elimination period, the only issue before this Court is whether plaintiff qualifies as disabled under Hartford Life's "own occupation" definition within the 36-month Elimination Period. Dkt. No. 30.

### 2. Hartford Life's Physical Demands Analysis

On October 21, 2019, Hartford Life completed a Physical Demands Analysis ("Analysis") based on the "Essential Job Duties" of plaintiff's occupation. AR 153-55. The Analysis indicated that plaintiff's occupation was "an outside sales position requiring activity to generate new clients and service existing clients." *Id*. Plaintiff worked eight hours a day, five days a week at an incentive/piece rate work pace; alternated between sitting and standing; talked to people in person, on the phone, and in group settings; constantly drove (68-100%); constantly travelled by airplane (68-100%); and used a keyboard. AR 153-54.

### 3. Hartford Life's Occupational Analysis

On October 22, 2019, Hartford Life completed an Occupational Analysis ("OA"). AR 09. The purpose of the OA was to "clarify own occupation in the general workplace." *Id*. The OA was completed by comparing plaintiff's job as an Employee Benefits Insurance Agent for BB&T Corporation to the "own occupation in the general workplace of Sales Agent, Insurance." *Id*. The OA concluded that plaintiff's occupation in the general workplace was "[l]ight with frequent reaching, handling and fingering . . . occasionally lifting/carrying . . . up to 20 pounds." AR 8.

### 4. Plaintiff's Employability Analysis

Plaintiff submitted an Employability Analysis ("EA") in her appeal of Hartford Life's denial LTD benefits. AR 555-564. The EA was performed by Frank Diaz, a vocational expert, of Diaz & Company on June 18, 2019. AR 555, 564.

The EA concluded that plaintiff was unable to perform the essential functions of her occupation as an Employee Benefits Insurance Agent. *Id*. According to the EA, plaintiff's involuntary jerking prevented her from driving and "from being able to conduct interviews and in-person presentations to prospective clients, which is an Essential Function of [plaintiff's occupation]." AR 558. The EA also stated that plaintiff's inability to concentrate, engage in normal daily activities, perform normal office tasks, maintain optimal cognitive performance, engage in visual and immediate memory, and weakness in verbal fluency, processing speed prevented plaintiff

from performing the essential functions of her occupation. AR 558-562.

### D. Plaintiff's Medical Condition and Treatment

#### 1. Plaintiff's Initial Symptoms and Treatment

Plaintiff reported that she was bitten by a tick on May 27, 2016 and subsequently diagnosed with Lyme disease. AR 1622. She was treated with antibiotics, but continued to experience fatigue, anxiety, and trouble sleeping. *Id*. By 2017, plaintiff experienced swelling and fluid buildup in her knees, depression, and pain while walking up and down stairs. *Id*. Plaintiff's primary care physician treated plaintiff's new symptoms and linked them to plaintiff's initial Lyme disease diagnosis. However, plaintiff continued to experience insomnia, dizziness, ear and eye pressure, excessive yawning, exhaustion, and headaches. *Id*.

On December 5, 2017, plaintiff met with Dr. Ramzel Asfour, board certified in Infectious Diseases and Internal Medicine, to discuss her symptoms. AR 1013-18, 1691. After an initial consultation, Dr. Asfour ordered a SPECT brain scan and lab testing to confirm plaintiff's diagnosis and "rule out other possibilities." AR 1015.

#### 2. Plaintiff's Medical SPECT Brain Scan and Lab Tests

On December 27, 2017, plaintiff was given a SPECT brain scan at Cedars-Sinai. AR 1707. On December 28, 2017, Dr. Alessandro D'Agnolo stated that the SPECT brain scan showed "moderate heterogeneous decreased activity in the frontal cortex bilaterally, worse on the left, as well as in the temporal cortex bilaterally, also worse on the left side." AR 1708. Dr. Agnolo stated that the SPECT brain scan findings were nonspecific and could be associated with fibromyalgia, vasculitis, and toxic exposure and recommended additional testing. *Id.* On January 2, 2018, Dr. Alan Waxman clarified that plaintiff's decreased activity in the frontal lobes were statistically significant and, although the findings alone could not confirm a diagnosis, plaintiff's decreased brain activity was associated with several types of vasculitis. AR 1707.

Several lab tests corroborated the presence of plaintiff's symptoms. On January 18, 2018, plaintiff had a Lyme disease lab test collected by Stony Brook University Hospital. AR 1692. The

6

comments of the Lyme disease lab test stated "[w]hile there is some band reactivity [to Lyme], [the] results do not meet the CDC criteria for a positive Lyme Western Blot . . . a Western blot that contains specific bands but does not meet the positive CDC criteria is considered 'indeterminate' by the New York State Department of Health." *Id*. On January 10, 2018, the results of a lab test from Armin Labs, interpreted by Dr. Armin Schwarzbach, showed that plaintiff was "weak positive" for borrelia burgdorferi and babesia mioroti elispot. AR 1693-94. Finally, a lab report from Quest Diagnostics, dated January 11, 2018, indicated that plaintiff had suffered from infections and suggested the presence of an autoimmune disease. AR 1695-1700,1702.

### 3. Plaintiff's Continuing Symptoms and Treatment

On March 9, 2018, during a follow-up appointment with Dr. Asfour, plaintiff reported that she was experiencing fatigue, headaches, dizziness, and involuntary jerking of her arms and legs. AR 1019. Dr. Asfour witnessed small jerking movements of plaintiff's arms and trembling of the jaw. AR 1019-1020. Dr. Asfour believed that the jerking movements were worsened by plaintiff's antidepressant medication, suggested plaintiff stop taking the antidepressant medication, and prescribed plaintiff with supplements to address Lyme disease. AR 1023. Plaintiff had additional appointments with Dr. Asfour on April 25, 2018, May 30, 2018, and June 13, 2018 to treat her fatigue, insomnia, headaches, tremors, and involuntary jerking movements. AR 1027-1037.

On May 25, 2018, while Hartford Life was considering plaintiff's STD benefits claim, Dr. Asfour reported to Hartford Life:

> "I believe that [plaintiff's] health issues are serious and limiting. She cannot work because of cognitive impairment as corroborated by her decidingly abnormal SPECT scan. She also has had a classic erytherna migrans rash and suggestive Lyme serology. My principal diagnosis is Lyme disease involving the central nervous system. This causes fatigue. depression, joint pains (especially in her knee) and cognitive impairment. In addition to suggestive Lyme tests from Stony Brook University and Armin labs, she has a positive ANA with a homogeneous pattern which in her case likely indicates abnormal immune system functioning and is consistent with a CNS vasculitis."

AR. 1691. Dr. Asfour added that plaintiff's symptoms included untreatable headaches, trouble

remembering things, tremors, and body jerking so severe that plaintiff was no longer able to drive. AR 1654.

Plaintiff also met with Dr. Cowan and Dr. Holly Christy in the state of Washington for treatment of her symptoms. AR 872-74, 889-890, 895-897. Dr. Christy, from the Virginia Medical Center, described plaintiff's jerking as involuntary movements of the arms. AR 872-74. Dr. Cowan, from Element 7 Wellness, reported that plaintiff's legs, hands, and feet jerk. 895-903.

### E.  Plaintiff's Claim for LTD Benefits

On August 17, 2018, plaintiff applied for LTD benefits. AR 78-79. Plaintiff provided an Attending Physician Statement ("Statement"), completed on August 14, 2018, from Dr. Asfour in support of her LTD claim. AR 494-95. The Statement stated that plaintiff had myoclonus, unspecified tremors, fatigue, mild cognitive impairment, headaches, fatigue, dizziness, and poor concentration. AR 494. According to the Statement, Dr. Asfour's "Objective Physical Findings" included "uncontrollable upper extremities, myoclonic jerking occasionally involving the head severe enough to limit ability to work." *Id*.

### F.  Hartford Life's Review of McCulloch's LTD Claim

On November 2, 2018, Hartford Life denied plaintiff's LTD claim. AR 103. According to Hartford Life's denial letter, plaintiff's medical records "did not provide any objective exam findings or other assessments to support the severity of [McCulloch's] symptoms" and did not state specific work restrictions. AR 105. Hartford Life relied on a report from its medical expert, Dr. Farache, and concluded that there were no restrictions or limitations on McCulloch from a neurological perspective. *Id*.

### G.  Plaintiff's Appeal of Hartford Life's Denial of Long Term Disability Claim

On June 18, 2019, plaintiff appealed Hartford Life's denial of her LTD claim. AR 533. Plaintiff relied on reports from Dr. Christopher Snell, Dr. Glenn Goodwin, Dr. Asfour, and Frank Diaz. Dr. Snell, an expert in exercise and movement science, performed two-day a cardiopulmonary

exercise test ("CPET") on plaintiff and concluded that plaintiff was significantly impaired because of her reduced ability for oxygen consumption and energy consumption.[3] AR 783-797. Dr. Goodwin, a licensed psychologist, performed a neuropsychological consultation on plaintiff. AR 755-782. Dr. Goodwin concluded that plaintiff lacked the cognitive capacity to sustain her employment because she suffered from fatigue and weakness in memory processing speed. AR 769-770. Frank P. Diaz, a vocational expert, concluded that McCulloch was "unable to perform the Essential Functions of her occupation of Senior Vice President/Employee Benefits Insurance Agent." AR 555-564.

Plaintiff also relied on a letter from Dr. Asfour to dispute Dr. Farache's conclusions. AR 753-54. Dr. Asfour stated that, based on the SPECT scan findings, CPET performed by Dr. Snell, and the neuropsychological test performed by Dr. Goodwin, plaintiff suffered from central nervous system vasculitis[4] because of active Lyme Disease or Post-Treatment Lyme Syndrome. AR 753-54.

### H. Hartford Life's Review of Plaintiff's Appeal

On June 19, 2020, Hartford Life began its review of plaintiff's appeal. AR 97. The review consisted of evaluations of plaintiff's file by Dr. Nick DeFilippis, Dr. Elena Schiopu, and Dr. Benton Ashlock; none of these reviewers examined or interviewed plaintiff. AR 257-263, 271-78, 161-68. Dr. DeFilippis, an expert in neuropsychology, concluded that plaintiff's cognitive impairment was most likely caused by psychological somatization rather than a physical brain impairment. AR 262-

---

[3] According to Dr. Snell, plaintiff was limited to activity that has an energy expenditure of less than 7.4 ml $kg^{-1}min^{-1}$. AR788. Dr. Snell's report provided the following energy expenditure comparisons:
> "The estimated oxygen requirement for seated office or computer work is 5.25 ml $kg^{-1}min^{-1}$. For normal office tasks, the energy cost rises to 10.5 ml $kg^{-1}min^{-1}$ … Driving to and from work would require 8.75 ml $kg^{-1}min^{-1}$ of oxygen. In addition, everyday activities such as showering (7.0 ml $kg^{-1}min^{-1}$) or making the bed (11.6 ml $kg^{-1}min^{-1}$) represent significant energy demands. Walking at a slow pace (2.5 mph) while carrying light objects (<25lbs) has an energy cost of 12.25 ml $kg^{-1}min^{-1}$ which is above the patient's V/AT."

[4] Central Nervous System Vasculitis is an inflammation of the brain's arterial system. AR 753.

263. Dr. DeFilippis also reported that Dr. Goodwin's report could not be used to evaluate plaintiff because the report lacked a full history of plaintiff's history and test scores. AR 263.

Dr. Schipou, an expert in rheumatology, concluded that plaintiff suffered from fibromyalgia syndrome. AR 277. Dr. Schiopu stated that, because of plaintiff's fibromyalgia syndrome, "[t]here is absolutely no benefit in rest and social disengagement" for plaintiff. AR 278. Dr. Schiopu also disagreed with Dr. Snell's finding of low functional cardiopulmonary function and noted that plaintiff's results could be the result of deconditioning. AR 275.

Finally, Dr. Ashlock, board certified in pulmonology and internal medicine, concluded that plaintiff's symptoms were caused by plaintiff's stress from family life. AR 166. Dr. Ashlock concluded that Dr. Snell's CPET findings were "isolated and unexplained source of investigation into to [plaintiff's] air hunger and fatigue" and "no documentation that would support the presence of fatigue/air hunger of the severity to result in [plaintiff's claimed] loss of function.".AR 166, 168. Dr. Ashlock concluded that plaintiff could perform the duties of her job. AR 167.

I.  **Plaintiff's Response to Hartford Life's Medical Reviewers**

On September 3, 2019, Dr. Snell responded to Dr. Schiopu's report and disagreed with Dr. Schiopu's fibromyalgia diagnosis. AR 229-238. Dr. Snell criticized Dr. Schiopu for failing to consider the complete data set from the CPET scan and argued that plaintiff's results are not caused by deconditioning.[5] AR 232-34.

On September 5, 2019, Dr. Goodwin responded to Dr. DeFilippis's report and explained that somatization is not an intentional exaggeration of symptoms and does not preclude a finding of an underlying health condition AR 224-28. Regarding Dr. DeFilippis's allegation that Dr. Goodwin failed to include all of plaintiff's history and test scores, Dr. Goodwin explained that he provided all of plaintiff's relevant psychiatric history, and that original report did not include test scores because

---

[5] Dr. Schiopu filed an addendum to her original report on October 1, 2019. AR 201-203. Dr. Schiopu conceded that she did not have a specialty to interpret the details of the CPET. AR 203. However, Dr. Schiopu disagreed with Dr. Snell's finding that plaintiff could not perform sedentary work with daily activities. Dr. Schiopu also stated that there was a lack of objective evidence to support plaintiff's involuntary jerking movements.

there was no set standard in neuropsychology about how to report test results.[6] *Id.*

### J. Hartford Life's Denial of Plaintiff's Appeal

On November 20, 2019, Hartford Life denied McCulloch's appeal. AR 82-87. Hartford Life cited the medical reports of Dr. DeFlippis, Dr. Schiopu, and Dr. Ashlock as evidence that plaintiff was not restricted in performing the essential duties of her occupation. AR 84-86. Hartford Life also relied on its OA in classifying plaintiff's occupation as "Light in the general workplace." AR 86. Hartford Life ultimately concluded that "although [plaintiff] has ongoing symptoms . . . the medical evidence on file does not support that these symptoms are of such severity that she would be precluded from performing her own Light level occupation." *Id.*

### K. Plaintiff's SSA Award

On August 30, 2020, the SSA awarded McCulloch monthly disability benefits. Ex. 3 Dkt. No. 35. The SSA award stated that plaintiff, under SSA's rules, became disabled on March 12, 2018. *Id.*

## CONCLUSIONS OF LAW

### A. Standard of Review

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, each of the parties moves for judgment in its favor on Plaintiff's ERISA claim. Under Rule 52, the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir.1999). The parties agreed that the issue before this Court is whether plaintiff qualifies as disabled

---

[6] Dr. DeFilippis filed an addendum on October 1, 2019. AR 194-96. In the addendum, Dr. DeFilippis stated that plaintiff's attention and memory issues were most likely the result of "emotional problems rather than an organic brain syndrome" because organic brain syndromes are more likely to result in more consistent displays of attention and memory impairment. AR 196. Dr. DeFilippis also stated that he "would be happy to review raw test data from Dr. Goodwin that may clarify the severity of the claimant's cognitive issues and allow me to comment further on possible limitations." *Id.*

11

under the Plan's "Your Occupation" definition. Dkt. No. 30.

The parties also agreed to a de novo standard of review. Dkt. No. 34 at 17; 35 at 20. A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006). De novo review requires district courts to "undertake an independent and thorough inspection of an administrator's decision." *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006). "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). Plaintiff has the burden of proving by a preponderance of the evidence that he or she was disabled under the insurance plan. *Armani v. Northwestern Mutual Life Ins. Co.*, 840 F.3d 1159, 1162-1163 (9th Cir. 2016).

**B.  Discussion**

The main issues in the parties' cross-motions for summary judgment involve the meaning of "Your Occupation" under Hartford Life's Plan and whether plaintiff has met her burden of proving that she was disabled from performing her own occupation.

### 1.  Plaintiff's Occupation

This Court must determine the meaning of "Your Occupation"" under Hartford Life's LTD Plan. Hartford Life argues that plaintiff's occupation was a "light" duty occupation. Dkt. No. 34 at 17; 39 at 3. In its denial of plaintiff's LTD appeal, Hartford Life described plaintiff's occupation as one that is "Light in the general workplace . . . . exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly . . . to move objects." AR 86.

Plaintiff argues that plaintiff's occupation requires plaintiff to perform a "high amount of physical and mental energy . . . . not a job that could be performed in a quiet, isolated office setting". Dkt. No. 35 at 2. Plaintiff asserts that Hartford Life erred in its application of "your occupation" by

failing to consider plaintiff's actual duties as an Employee Benefits Insurance Agent. Dkt. No. 35 at 27-28.

The Court agrees with plaintiff and finds that Hartford Life incorrectly applied the definition of "Your Occupation" as stated in Hartford Life's LTD Plan. The LTD Plan defines disability as a condition that prevents a claimant from performing one of more of the Essential Duties of "your occupation." AR 1870. The term, "Your Occupation," is defined as "the [e]ssential [d]uties of the job [claimant] is performing for [her] [e]mployer." AR 1874. Unlike Hartford Life's STD Plan, the LTD Plan does not define "Your Occupation" as one in the general workplace. *Compare* AR 1898 (STD Plan defining "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location) *with* AR 1874 (LTD Plan defining "Your Occupation" as "the Essential Duties of the job You are performing for your Employer."). Instead, the plain language of the LTD Plan requires Hartford Life to determine disability based on the actual duties the plaintiff performed as an Employee Benefits Insurance Agent for BB&T Corporation – not whether plaintiff can perform "light work" in the general workplace.

The Court finds that plaintiff's occupation involved concentration, frequent driving, traveling by airplane, and keyboarding. Plaintiff earned approximately $312, 353 every year as an Employee Benefits Insurance Agent. AR 485, 567. She had fifteen clients and served each client by negotiating renewals, solving problems, and performing financial modeling of different carriers and plan designs for each client. AR 485. Hartford Life described plaintiff's occupation as "tough . . . with quotas that carry a lot of stress . . . requiring driv[ing] and see[ing] each [of plaintiff's 15 clients] once per quarter" Dkt. No. 34 at 4, 19. Notably, Hartford Life's Physical Demands Analysis stated that plaintiff's outside sales position had essential job duties that involved constant driving, airplane travel, and fine finger manipulation on a keyboard. AR 153.

### 2. Plaintiff's Disability

This Court must next determine whether Plaintiff was disabled under the terms of Hartford Life's LTD Plan. The Court concludes that she was.

13

Plaintiff argues that the medical reports from Dr. Asfour, Dr. Snell, Dr. Goodwin, Mr. Diaz, and portions of Dr. Schiopu's report support a finding of disability. Dkt. No 35 at 20-24. Plaintiff asserts that Hartford Life's experts, Dr. Farache, Dr. Ashlock, and Dr. DeFilippis, failed to consider plaintiff's complete history and test results. *Id.* at 25-27.

Hartford Life argues that plaintiff failed to prove that she was disabled under Hartford Life's LTD Plan. Hartford Life argues plaintiff's claims are based on "somatic complaints caused by occupational stress" and that plaintiff's "real problem seems to be that she found her job and lifestyle extremely stressful." Dkt. No. 34 at 20. Hartford Life asserts that plaintiff's LTD claim failed to provide medical support and objective testing. *Id.* at 22-28.

After carefully considering all arguments, the Court finds that plaintiff has established by a preponderance of the evidence that she was disabled under Hartford Life's LTD Plan. The record demonstrates that plaintiff's conditions prevented her from performing the essential duties of her occupation as an Employee Benefits Insurance Agent. Notably, Hartford Life approved plaintiff's STD claim and found plaintiff's fatigue, mild cognitive impairment, headaches, fatigue, dizziness, tremors, and poor coordination to be a "disability [that] is medically supported." AR 1652, 1654. *See Muniz v. AMEC Constr. Mgmt., Inc.,* 623 F.3d 1290, 1296-97 (9th Cir. 2010) ("[T]he fact that the claimant was initially found disabled under the terms of the plan may be considered evidence of the claimant's disability"); c*f. Karla H. Abatie c. Alta Health & Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006) ("A procedural irregularity . . . is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."). The SSA also concluded that plaintiff was disabled. *Cf. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011) ("Evidence of a [SSA award] of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion. [SSA award is] [w]eighty evidence [which] may ultimately be unpersuasive, but it cannot be ignored."); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) ("[N]ot distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence"). Plaintiff received treatment for her symptoms from Dr. Asfour. AR 753-54.

Objective tests support plaintiff's disability. Plaintiff had lab tests, a CT with PE protocol,

14

SPECT scan, and a CPET. AR 273, 754. Plaintiff's tests support a diagnosis of central nervous system vasculitis. The lab tests suggested that plaintiff suffered from an autoimmune disease. AR 943. Moreover, Dr. Asfour explained that the SPECT scan showed that plaintiff had abnormal frontal lobes, suggesting a diagnosis of central nervous system vasculitis.[7] AR 753. Dr. Asfour also explained that the non-specific findings of the SPECT scan mean that the cause of the central nervous system vasculitis is unknown, however plaintiff's conditions are most likely caused by Lyme disease because of the lack of definitive findings in plaintiff's lab work. Central nervous system vasculitis explains plaintiff's cognitive problems with memory and concentration, difficulty with coordination, fatigue, and jerking movements. AR 754.

Plaintiff's CPET[8] results are consistent with Dr. Asfour's central nervous system vasculitis diagnosis. AR 754. The CPET showed that plaintiff had abnormal metabolic responses, abnormal workload capacity, abnormal respiratory responses, and abnormal recovery responses. According to Dr. Snell, these abnormal responses limited plaintiff's ability to safely perform certain activities without experiencing "system exacerbation and delayed recovery." AR 788. Plaintiff could not drive or walk at a slow pace while carrying light objects. *Id*. Moreover, plaintiff's objective neuropsychological consultation with Dr. Goodwin found a clear pattern of weakness of processing speed and memory processing, which was consistent with plaintiff's SPECT scan and CPET results. AR 755-782. Dr. Goodwin explained that plaintiff could not sustain intellectual and neurocognitive energy over an extended period. AR 770.

---

[7] According to Dr. Asfour, central nervous system vasculitis is "an inflammation of the arterial system of the brain." AR 753.

[8] According to Dr. Snell's report, a CPET is
> "considered the gold standard [in exercise science and medicine] for measuring and evaluating functional capacity and fatigue. Position statements and/or guidelines for the performance of this testing are available from the American College of Sports Medicine, American Heart Association, American College of Chest Physicians, American Thoracic Society and the American Medical Association, among others. All endorse this method of testing and acknowledge peak oxygen consumption, only available with CPET, as the most accurate measurement of functional capacity."

AR 184.

15

Given that plaintiff's condition prevents her from driving and significantly impairs her physical and cognitive ability, the Court finds that plaintiff is disabled under Hartford Life's LTD Plan. As discussed above, the essential duties of plaintiff's occupation involved constant driving and servicing each of her clients by negotiating renewals, solving problems, and performing financial modeling of different carriers and plan designs. Plaintiff's central nervous system vasculitis and resulting involuntary body tremors and jerking effectively prevent plaintiff from driving to meet her clients. Plaintiff's CPET results show that Plaintiff would not be able to engage in normal activities, drive, or walk a slow pace while carrying objects less than twenty-five pounds. AR788. Moreover, plaintiff's cognitive impairment, as explained by Dr. Asfour and Dr. Goodwin, would interfere with plaintiff's ability to engage in the high level processing required to negotiate renewals, problem solve, plan insurance designs, and perform financial modeling of different insurance carriers.

The Court gives little weight to the vague and conclusory reports of Hartford Life's experts. Dr. Schiopu disagreed with Dr. Snell's interpretation of plaintiff's CEPT results and concluded that plaintiff's condition would not "preclude any individual from performing gainful sedentary work," AR 201-03, 271-78. However, whether plaintiff is disabled under the LTD Plan does not involve an evaluation of whether plaintiff could perform sedentary work. Instead, the Plan requires consideration of "the [e]ssential [d]uties of the job [plaintiff] is performing for [her] [e]mployer." AR 1874. *See Polnicky v. Liberty Life Assurance Co. of Boston, et al.*, No. 13-cv-01478, at *9 2014 WL 6680725 (N.D. Cal.Nov. 25, 2013) ("By itself, Liberty Life's conclusion that plaintiff could perform full-time *sedentary* work does not mean that plaintiff was capable of performing the material and substantial duties of his "Own Occupation."); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) (denial of benefits based upon a finding that claimant could perform sedentary work was erroneous because "simply being able to perform sedentary work does not necessarily enable one to work" in an occupation that requires "careful thought and concentration"). Therefore, Dr. Schiopu failed to indicate whether plaintiff's conditions prevented plaintiff from performing the essential duties as an Employee Benefits Insurance Agent. Moreover, Dr. Schiopu listed restrictions that plaintiff should follow in order to work, such as sitting up to 1 hour at a time

for a maximum of 8 hours a day, walking for up to 1 hour at a time for a maximum of four hours per day, and limiting her work to a quiet office area with a door. AR 278. Finally, regarding the CPET, Dr. Schiopu admitted that she did not specialize in a field that would allow her to interpret plaintiff's CPET results. AR 203.

The Court is also unpersuaded by Dr. DeFilippis's report. Dr. DeFilippis stated that plaintiff's symptoms were likely caused by somatization and did not present an opinion on whether plaintiff was functionally impaired from a neuropsychological perspective because of a lack of information from Dr. Goodwin's report. AR 257-63; 194-96. However, Dr. Goodwin explained that somatization does not preclude the presence of real symptoms, especially for plaintiff, who had had documented medical conditions. AR 226. Moreover, Dr. DeFilippis did not explain why the data already provided by Dr. Goodwin was insufficient for an evaluation.

Hartford Life relies on Dr. DeFilippis's report to assert that plaintiff's symptoms were caused by a psychological condition, rather than a physical condition such as central nervous system vasculitis. Dkt. No. 34 at 15. The Court rejects Hartford Life's assertion. As stated above, the record reflects that plaintiff's conditions were caused by central nervous system vasculitis. *See Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999) (concluding that plaintiff suffered from a physical condition even though plaintiff exhibited psychiatric symptoms before and after diagnosis).

The Court is also unpersuaded by Dr. Ashlock's report. Dr. Aslock concluded that plaintiff's file did not demonstrate functional impairment from fatigue, "air hunger," or medication side effects. AR 166-69. Dr. Ashlock disregarded the results of the CPET as an "isolated and unexplained source of investigation into [plaintiff's] reports of air hunger and fatigue" without explaining why the CPET was isolated or how Dr. Snell's report of the CPET findings were unexplained. AR 166. However, the Institute of Medicine has recognized the CPET as an objective measure of reduced function after exertion. AR 130.

Finally, the Court is unpersuaded by Dr. Farache's report. Dr. Farache stated that plaintiff's jerking movements were "poorly described and not likely impairing . . . [because plaintiff] was able to walk and talk while having these movements." AR 879. However, plaintiff's jerking movements

were witnessed by multiple doctors and each doctor described plaintiff's jerking movements. Dr. Asfour stated that plaintiff had body jerking and trembling that were so severe that she could no longer drive. AR 1654. Dr. Christy, from the Virginia Medical Center, described plaintiff's jerking as involuntary movements of the arms. AR 872-74. Dr. Cowan, from Element 7 Wellness, reported that plaintiff's legs, hands, and feet jerk. 895-903. Even if, as stated by Dr. Farache, plaintiff was able to walk and talk while experiencing jerking movements, Dr. Farache did not address the fact that plaintiff was unable to drive because of the jerking movements.

Hartford Life relies on its experts' reports to argue that plaintiff failed to present objective data to prove her disability and the severity of her symptoms. Dkt. No. 39 at 10; AR 105. Hartford Life specifically claimed that it needed "objective physical examination findings" of the severity of plaintiff's tremors. AR 113.

The Court disagrees with Hartford Life. Regarding plaintiff's fatigue, Dr. Goodwin explained that fatigue is difficult to measure. AR 773. Dr. Goodwin also stated that he performed objective neurocognitive testing on plaintiff. AR 773, 1287. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) ("[C]onditioning an award on the existence of evidence that cannot exist is arbitrary and capricious."). Regarding plaintiff's tremors, Dr. Asfour explained that he witnessed plaintiff's jerking movements approximately every 10 minutes. AR 1389; *see* id. ("Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established."). Notably, Dr. Schiopu stated in her report that plaintiff's file consisted of some "objective tests such as CT with PE protocol, a brain SPECT, and blood work." AR 273. Finally, the record reflects that a CPET gives objective evidence of functional impairment and fatigue. AR 130, 234, 815-821, 824-831.

**CONCLUSION**

For the foregoing reasons, the Court finds that plaintiff was disabled from performing her own occupation within the meaning of Hartford Life's LTD Plan. Accordingly, the Court GRANTS plaintiff's motion for judgment and DENIES defendant's motion.

The Court schedules a further Case Management Conference for January 22, 2021 at 3:00 p.m., to determine what further proceedings are required in this case.

**IT IS SO ORDERED**.

Dated: December 29, 2020

_____

SUSAN ILLSTON
United States District Judge